

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 8, 2024**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In re: | § |
| | § Case No. 19-45113-ELM |
| JESSE WAYLON TATUM, | § |
| | § Chapter 7 |
| Debtor. | § |
| | § |
| JAMES P. ANDERSON, | § |
| | § |
| Plaintiff, | § |
| v. | § Adversary No. 20-04027 |
| | § |
| JESSE WAYLON TATUM, | § |
| | § |
| Defendant. | § |

## MEMORANDUM OPINION

In this action, Plaintiff James P. Anderson has filed suit against Defendant Jesse Waylon Tatum, the chapter 7 debtor in Case No. 19-45113 ("**Bankruptcy Case**"), to seek a determination of nondischargeability with respect to a prepetition judgment that Mr. Anderson obtained against

Mr. Tatum.  Pursuant to his Complaint,[1] Mr. Anderson asserts that the judgment debt is for money, property or services obtained by false pretenses, a false representation, or actual fraud in connection with a roof replacement project that Mr. Tatum sold Mr. Anderson on prepetition, thereby excluding the judgment debt from discharge pursuant to section 523(a)(2)(A) of the Bankruptcy Code.[2]

Mr. Tatum timely filed an Answer in opposition to the Complaint.[3]  He asserts that the prepetition judgment was taken by default against him and does not expressly determine that he made any fraudulent misrepresentations or otherwise engaged in fraudulent conduct.  He further asserts that he never made any representations to Mr. Anderson that he knew to be false and that he never took any action with the intent to deceive or otherwise cause harm to Mr. Anderson.[4]

---

[1] *See* Docket No. 14 (First Amended Complaint, referred to herein as simply the "**Complaint**").

[2] 11 U.S.C. § 523(a)(2)(A).

[3] *See* Docket No. 15 (the "**Answer**").

[4] Within the affirmative defenses asserted by Mr. Tatum in his Answer is a request for an award of costs and attorney's fees under 11 U.S.C. §§ 105 and 523(d).  *See* Answer, ¶ 47.  In relation to such request, nowhere within § 105 of the Bankruptcy Code is there a fee shifting provision applicable to actions under § 523 of the Bankruptcy Code or to adversary proceedings generally.  *See* 11 U.S.C. § 105.  Section 523(d), however, does set forth a fee shifting mechanism, providing for a defending debtor's recovery from a plaintiff creditor of costs of, and a reasonable attorney's fee for, a § 523(a)(2) proceeding if the § 523(a)(2) action involves a "consumer debt" and "the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust."  *Id.* § 523(d).  That said, in this case, not only did Mr. Tatum fail to invoke the provisions of § 523(d) as an affirmative claim for relief (as opposed to an affirmative defense), he also failed to preserve the claim/issue for trial in the Pretrial Order.  *See* Docket No. 36 (Joint Proposed Pretrial Order (the "**Pretrial Order**") (¶¶ 26-32 (Mr. Tatum's Summary of Defenses) and ¶¶ 39-48 (statement of Contested Issues of Fact and Contested Issues of Law), in each case omitting any reference to a § 523(d) claim or request for relief); Docket No. 38 (order approving and adopting Pretrial Order); *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 245 (5th Cir. 2005) ("It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented without objection").  Even if Mr. Tatum had not waived the § 523(d) request for relief, it is doubtful that the judgment debt at issue in this case is a "consumer debt" as required by § 523(d), *see* 11 U.S.C. § 101(8) (defining a "consumer debt" as a "debt incurred by an individual primarily for a personal, family, or household purpose"), and no evidence was introduced by Mr. Tatum with respect to the costs and attorney's fees incurred in defending against the § 523(a)(2) claim.  *See Bell Nunnally & Martin LLP v. Kuper (In re Kuper)*, Adversary No. 20-04062, 2023 WL 6852843, at *1 n.5 (Bankr. N.D. Tex. Oct. 17, 2023) (dispensing with § 523(d) request for relief on the basis of waiver under the authority of *Arsement* and for failure to substantiate the costs and fees at issue).

Having now considered the Complaint, the Answer, the parties' joint statement of stipulated facts,[5] the parties' other pretrial submissions,[6] the evidence introduced at trial, the representations and arguments of counsel, and the Post-Trial Brief filed by Mr. Tatum,[7] the Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[8]

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409.  The proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(I).

## *FACTUAL BACKGROUND*

Mr. Anderson, a retired Air Force Veteran, is a resident of Arlington, Texas.  He owns a home at 904 Portofino Drive, Arlington, Texas 76012, which is the focus of the dispute in this case.

In late January 2017, Mr. Anderson noticed roofers doing work on a house across the street from his home.  Knowing that he had some deteriorated fascia boards running along the edge of his roof that needed to be replaced, he walked across the street to speak to the workers about the possibility of doing work for him.  There, he met Christopher Cooper.  Mr. Cooper explained to

---

[5] *See* Pretrial Order ¶¶ 33–38 (collectively, the "**Stipulated Facts**").

[6] *See* Docket Nos. 35 and 37.

[7] *See* Docket No. 47 (the "**Post-Trial Brief**").

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

Mr. Anderson that he was simply a contractor on the project, but indicated that he would let J. Duncanson Roofing, LLC ("**JDR**"), the roofing company for whom he was doing the work, know about his interest.  Mr. Cooper had in mind Mr. Tatum, one of JDR's Sales Managers.

Mr. Tatum first started working with JDR in August or September of 2015.  Because he had no prior experience in the roofing industry when he started, he trained for over a year under the tutelage of another salesperson, Stacy Beer.  Mr. Tatum effectively shadowed Ms. Beer for the first year plus of his employment, learning how to inspect roofs for damage, how to interface with insurance companies and adjusters, and how to sell roofing products and the hiring of JDR to handle the roofing replacement work.  Mr. Tatum was employed by JDR as an independent contractor and was compensated on a commission-based system.

**A.      Mr. Tatum Introduces Himself and Assists Mr. Anderson in Submitting
An Insurance Claim for Roof Damage**

On February 3, 2017, when Mr. Tatum was in the area to "knock doors" (terminology used by Mr. Tatum to refer to the door-to-door solicitation of business), Mr. Cooper made him aware of Mr. Anderson's interest and, thus, Mr. Tatum made it a point to knock on Mr. Anderson's door. After introducing himself as a JDR employee, Mr. Tatum presented his business card to Mr. Anderson, which described Mr. Tatum as a consultant and insurance specialist with JDR.[9]

Following the introduction, Mr. Anderson asked Mr. Tatum to take a look at the deteriorated fascia boards that he wanted to have replaced.  Mr. Tatum did so, but additionally proposed to inspect the roof while he was at it.  While Mr. Anderson had no real concern with respect to the roof, Mr. Anderson consented because Mr. Tatum told him that it would be a cost-free inspection.

---

[9] *See* Plaintiff's Exh. 3.

After performing the roof inspection, Mr. Tatum reported on the damage observed. Among other things, he had found evidence of hail dents and creases on the roof's seams consistent with 1-2 inch hail. In certain places, the creases had caused the nails holding down the roof's panels to become brittle and start coming off. Based upon the degree of damage observed, Mr. Tatum concluded that within five years a windstorm would likely cause Mr. Anderson's roof to start losing panels altogether. Consequently, he recommended to Mr. Anderson that the roof be replaced.

Learning that Mr. Anderson maintained his homeowner's insurance with USAA, Mr. Tatum emphasized his expertise in dealing with insurance companies and informed Mr. Anderson that JDR could handle everything from spearheading the insurance claim submission under the homeowner's policy, to interacting with the insurance adjuster on the roof inspection, to doing the roof replacement work, itself. Additionally, to get Mr. Anderson over the threshold of cost concerns, Mr. Tatum sold him on the concept that he would never, personally, come out of pocket on the project – it would all be handled through the insurance coverage without Mr. Anderson even having to cover the amount of the deductible under the policy. As a result, figuring that he had nothing to lose, Mr. Anderson agreed and together they called USAA to report the damage and schedule an appointment for an adjuster to inspect the roof. Mr. Tatum then began to fill out a JDR roof replacement cost estimate.[10]

Later that month, an insurance adjuster came out to Mr. Anderson's house to conduct the inspection. Mr. Tatum made it a point to be present during the inspection so that, among other things, he could confer with the adjuster and point out the areas of damage discovered. Following the inspection, Mr. Anderson's claim was approved and thereafter, by letter dated February 23,

---

[10] *See* Plaintiff's Exh. 19 (reflecting original date of 2/3/17, prior to later completion and execution on 2/28/17).

2017, USAA provided notice of the approval, indicating that the estimated cost of replacing the roof was $42,228.57 and that, after taking into account the policy's $2,000 deductible, an initial check of $33,840.87 would be issued followed by a subsequent payment of up to $6,387.70 upon completion of the repairs/replacement once the actual cost of the repairs/replacement were known.[11]  Thus, based upon the calculation included within the letter, USAA agreed to pay up to $40,228.57 for the roof replacement, with $33,840.87 of the amount to be funded immediately.

**B.**      ***Mr. Tatum Successfully Sells Mr. Anderson on JDR for the Roofing Project***

With the USAA letter in hand, Mr. Anderson informed Mr. Tatum of the approval and on February 28, 2017, Mr. Tatum came back out to Mr. Anderson's house to complete the JDR cost estimate.  Using the USAA letter, Mr. Tatum provided for an initial down payment of $33,840.87 (unsurprisingly tied to the amount of the initial USAA insurance payment) and provided for a final payment due upon completion of $6,387.70 (again, unsurprisingly tied to the maximum recoverable final payment reflected in the USAA letter).[12]  Subject to finalizing the details of the work to be performed, Mr. Anderson agreed in principle to hire JDR based upon the estimate.

To facilitate completion of the work order form, Mr. Tatum presented Mr. Anderson with a Gerard metal roofing brochure.  At the time, Gerard was JDR's favored manufacturer of roofing materials.  In going through the Gerard brochure, Mr. Anderson selected the Classic Tile metal roofing profile with the color Barclay.[13]  Significantly, Mr. Anderson's attention was also drawn to the page of the Gerard brochure describing different types of installation systems (*i.e.*, non-

---

[11] *See* Plaintiff's Exh. 21.

[12] *See* Plaintiff's Exh. 19.

[13] *See* Plaintiff's Exh. 10, at p.5 (Gerard brochure page describing the Classic Tile profile).

batten, batten, and counter-batten systems) and, in particular, the energy efficiency of the batten and counter-batten systems.[14]  As explained in the brochure:

> Although a non-batten installation in [sic] approved, the single most optimal installation system is to use a batten or counter-batten grid with our batten approved Barrel Vault, Canyon Shake and Classic Tile profiles.  An independent study confirmed a stone-coated metal roof installed with a counter-batten system can reduce heat gain up to 45 percent, compared with asphalt shingles.  Combine air movement between the deck and panels with Gerard's stone-coated metal roof, and you've got one of the world's most energy-efficient, eco-friendly roofing systems. Both batten and counter-batten systems create a larger air space that results in reduced heat gain during the summer months, and stabilized roof temperatures to minimize ice damming and heat loss in the winter months.[15]

The same page of the brochure featured a picture of a counter-batten grid.[16]  Mr. Anderson was highly interested in obtaining an energy efficient installation because he had recently invested roughly $12,500 to install new energy-efficient air conditioning and heating equipment in his home.  He had also been encouraged by one of his neighbors to be sure to obtain a radiant barrier for the roof to further cut down on the heat during the summer months.

Hence, when Mr. Tatum returned the next day, on March 1, 2017, to complete the work order form, after informing Mr. Tatum of his Classic Tile and Barclay profile and color selections, Mr. Anderson emphasized the importance of obtaining the energy efficient installation and radiant barrier.  With respect to the installation system, while Mr. Anderson did not identify the counter-batten system by name, he showed Mr. Tatum the page of the Gerard brochure on which the above-quoted energy efficiency language was included and on which the counter-batten grid was pictured.  As for the radiant barrier request, Mr. Tatum had no familiarity with radiant barrier products.

---

[14] *See id.*, at p.14 (Gerard brochure page with the heading "Install Roofing Systems that Deliver Energy Efficiency").

[15] *Id.*

[16] *See id.*

The work order form did not include a place to signify either the type of installment system to be utilized or the add-on feature of a radiant barrier. Consequently, Mr. Tatum found it necessary to place a call into the JDR home office for guidance. Upon placing the call, Mr. Tatum was connected with Ms. Beer. After first attempting to describe to Ms. Beer what Mr. Anderson was looking for, Mr. Tatum turned the phone over to Mr. Anderson to speak directly with Ms. Beer. During that call, Mr. Anderson again referenced the page in the Gerard brochure on which the counter-batten grid was pictured and the air flow and energy efficiency benefits were described. Turning to the radiant barrier, while Ms. Beer attempted to convince Mr. Anderson that it would be unnecessary given the type of roofing material to be used, Mr. Anderson was insistent. Mr. Anderson then returned the phone to Mr. Tatum for follow-up.

According to Mr. Tatum, Ms. Beer did not give any direction on how to complete the order form to signify a particular installation system. However, based upon the direct discussion that had taken place between Ms. Beer and Mr. Anderson, Mr. Tatum was under the impression that the JDR home office was clear on the type of installation system that Mr. Anderson desired. In relation to the radiant barrier, on the other hand, Ms. Beer gave the ok for Mr. Tatum to reflect on the interior work section of the form that JDR would install a radiant roll in the main house portion of the job, but not in the garage. Accordingly, Mr. Tatum added that language and assured Mr. Anderson that JDR would get the energy efficient installation desired and attempt to obtain the radiant barrier from Home Depot during the installation process.[17]

Mr. Tatum covered other aspects of the project with Mr. Anderson, completing the form to include replacement of the skylights, repair of the fascia boards, and replacement of the gutters.[18]

---

[17] *See* Plaintiff's Exh. 20.

[18] *See id.*

Mr. Tatum also specifically noted on the order form that Mr. Cooper would come out to do the trim work, taking off the gutters in the process to check for wear and tear and do restoration work where applicable if separately approved by Mr. Anderson and Mr. Tatum.[19]  Finally, remembering Mr. Tatum's comment during his initial inspection that some of the nails were coming out, Mr. Anderson requested the roof to be installed with screws instead of nails.  While there was no place on the order form to specify this requirement, Mr. Tatum agreed to ensure that screws would be used, indicating that he would also periodically come out to the house to check in on the status of the project to ensure that it was progressing as agreed upon.

Thus, with the work order form completed, coupled with Mr. Tatum's assurances, Mr. Anderson formally signed off on the cost estimate and work order form.[20]

## C.    The Roofing Project Commences; Problems Immediately Arise

A week or so later, Mr. Anderson received the initial $33,840.87 insurance check from USAA, which was jointly made out to Mr. Anderson and JPMorgan Chase Bank, N.A., Mr. Anderson's mortgage lender.  Once JPMorgan Chase Bank had also endorsed the check, Mr. Anderson delivered it to JDR.  JDR then ordered the materials for the project and paid Mr. Tatum an initial commission equal to 10% of the check.[21]

### 1.    The Delivered Materials

In mid-March 2017, the project materials were dropped off in Mr. Anderson's driveway. Mr. Anderson went out to take a look and right off the bat discovered that boxes of roofing nails,

---

[19] See id.

[20] See Plaintiff's Exhs. 19 and 20.

[21] Mr. Tatum's commission arrangement with JDR was for Mr. Tatum to receive 40% of the profit realized by JDR on each project closed by Mr. Tatum.  With respect to timing, JDR would make an initial payment equal to 10% of the down payment received from the customer, and then once the roofing job was completed, JDR would make another payment equal to 40% of the total profit realized less the initial 10% of the down payment already paid.

instead of screws, had been delivered and that no radiant barrier materials had been delivered.  As a result, he immediately contacted Mr. Tatum to complain.

While Mr. Tatum had no involvement in the ordering of project materials, Mr. Tatum came out to the house to assess the situation and, upon confirming the errors, contacted the JDR home office in an effort to get the problems fixed.  In the case of the nails, JDR promptly supplied screws to the site.  In the case of the radiant barrier, however, the radiant barrier materials were never obtained prior to installation of the new roof.[22]

### 2.    The "Tear Off" Phase

The first phase of the project was to remove the old roof (the "tear off" phase).  During the tear off, Mr. Anderson observed some areas of rotted wood under the existing tar paper towards the front of the house.[23]  Mr. Anderson also noticed that the contractors were not removing all areas of the tar paper.  Consequently, being concerned about the possible degree of damage that existed and how it might affect the integrity of the new roof, Mr. Anderson pointed out the rotted decking to one of the installation crew members, asking him if they would be able to install the new roof over the damaged decking.  The installation contractor informed him that they would need the rotted boards to be replaced because they could not install the new roofing over rotted decking.

Mr. Anderson raised the same issue later when he spoke to Mr. Tatum.  He asked Mr. Tatum how the rotted decking would be dealt with.  Based upon his training with Ms. Beer, Mr. Tatum responded that when the tear-off crew removed the old roof, they would replace the rotted decking with new decking.  He said that the crew would test the roof for rotted decking areas "by

---

[22] *See* Stipulated Facts ¶ 34.

[23] *See* Plaintiff's Exh. 67 (picture of rotted decking).

feel" while walking on it, and that if it felt squishy, the crew would know to lift the tar paper and fix the decking.

Ultimately, Mr. Anderson was led to believe that the installation crew had coordinated with the tear-off crew to have the rotted decking replaced before the installation phase began. Mr. Tatum likewise believed that the contractors had coordinated on replacing all of the rotted decking. As explained below, however, much of the rotted decking was never replaced.

### 3.    *The New Roof Installation*

Once the tear-off phase had been completed (or purportedly completed), installation of the new roof commenced. Again, there were problems. Instead of laying down a counter-batten grid for the installation, the contractors used a straight batten system.[24] Seeing this, Mr. Anderson immediately stopped the installation crew and showed them the picture of the Gerard brochure depicting the counter-batten grid that he had approved. He told them to stop all work until the matter had been sorted out with JDR.

Despite Mr. Tatum's assurance that he would come by the house at the start of the installation phase, Mr. Tatum was not present when the installation work began. This both frustrated and annoyed Mr. Anderson given the errors and he called Mr. Tatum to ask him where he was and to complain about the improper installation. Failing to reach Mr. Tatum, he left a message, and then also called the JDR office to inform the company that the crew was doing the work incorrectly. Shortly thereafter, the installation crew left the house.

According to Mr. Tatum, the reason he did not stop by the house on the day the installation began was that he was sick and had stayed home from work that day. Even so, later in the day, after listening to Mr. Anderson's voicemail, Mr. Tatum returned the call, apologizing for not being

---

[24] *See* Defendant's Exh. B, ¶ 6.L. (acknowledging that "Defendant installed Baton [sic] roofing").

on site, and after hearing about the problems he assured Mr. Anderson that he would call JDR to try to sort it out.  Mr. Tatum then contacted JDR to address the matter.  Shortly thereafter, Mr. Anderson received notice of a supplemental claim filed by JDR with USAA for an additional $1,200, which he assumed was for the missing materials.  His assumption proved to be wrong.

The next day, both Mr. Tatum and one of the installation crew members came out to the house to meet with Mr. Anderson.  At that time, Mr. Anderson was informed that the roofing materials supplier did not have the necessary counter-batten materials in stock.  So, they proposed to go with the normal batten system.  Mr. Anderson was livid.  In addition to expressing his dissatisfaction directly to Mr. Tatum, he also contacted JDR to lodge a complaint about Mr. Tatum to the JDR home office.

The following morning, James Duncanson, the manager and owner of JDR, informed Mr. Tatum that he was being taken off of the Anderson project given the number of calls received from Mr. Anderson and the level of dissatisfaction expressed by him.[25]  That same morning, a new installation crew arrived at Mr. Anderson's house.  The crew chief for the day, Antonio Razo, introduced himself to Mr. Anderson and informed Mr. Anderson that a counter-batten grid could not be used on his roof due to the roof's pitch.  Mr. Anderson was skeptical.  Mr. Razo also emphasized that the crew needed to finish the project with the existing installation materials because rain was in the forecast.  Consequently, feeling that he had no choice but to allow the crew to finish the work because of the interior damage that could result from the rain without a roof, he allowed the work to proceed under protest and the crew finished the installation with the standard batten system.

---

[25] JDR thereafter also recovered the 10% commission that had been paid to Mr. Tatum by deducting the amount from Mr. Tatum's subsequent commission checks on other deals.

In completing the work, the contractors failed to replace all areas of damaged decking, failed to install the promised radiant barrier, failed to replace the skylights, failed to repair the rotted/damaged fascia boards, and failed to install new gutters.  Thus, once again, Mr. Anderson called the JDR office to complain and inquire into how and when JDR would fix the problems. He also requested JDR to send Mr. Tatum back out to the house to inspect the project and ensure compliance with what Mr. Anderson had ordered.  JDR refused and thereafter stopped responding to Mr. Anderson's calls.

### D.      *Mr. Anderson's House is Red Tagged by the City*

Given the silent treatment from JDR, Mr. Anderson decided to pursue guidance from the City of Arlington.  The City, however, had no record of an approved roofing project at Mr. Anderson's house, nor did they even have any record of an application for a permit.  At this point, Mr. Anderson decided to take matters to a new level.  He prepared and delivered a demand letter to JDR, dated April 12, 2017 (the "**Demand Letter**"), to put JDR on notice of its failure to obtain a permit for the project and of its failure to complete the promised work in alleged violation of the Texas Deceptive Trade Practices Act (the "**DTPA**").[26]  Mr. Anderson identified the following categories of incomplete or defective work within the Demand Letter:

(1)      Failure to remove damaged components of the old roof and old, dry rotting edges and other wood before overlaying them with new roofing materials;

(2)      Failure to use the size of plywood allegedly required by applicable law;

(3)      Failure to use the type of installation agreed upon (*i.e.*, Gerard counter-batten system); and

(4)      Failure to install new gutters.

---

[26] *See* Plaintiff's Exh. 49.

After receiving the Demand Letter, JDR quickly applied for and obtained a permit from the City for the project, issued April 19, 2017.[27]  A few days after the permit's issuance, a City inspector contacted Mr. Anderson to schedule an inspection of the work.  The inspection took place on April 25, 2017.[28]  Upon arrival at the house, the inspector immediately observed the rotted fascia boards and asked to see Mr. Anderson's attic.  Once up there, she inspected the roof decking and the raptors.  In addition to finding rotted decking,[29] the inspector noticed a hole in the roof where someone had stepped through the rotted decking and simply covered it over with tar paper.[30]  This concerned her because, while the City does not require the overall replacement of decking before a new roof is laid, if the existing decking is rotted, it must be replaced.  Troubled by what she saw, the inspector informed Mr. Anderson that she could not sign off on the roof work and that the work would have to be redone.  Accordingly, she issued a red tag on the project, indicating that it had failed inspection.[31]

Weeks later, JDR workers arrived at Mr. Anderson's house to replace the gutters.  Upon seeing the rotted fascia boards and being informed by Mr. Anderson that they were to be replaced, however, the contractors explained to Mr. Anderson that they would wait to install the new gutters until after the fascia boards were replaced.  Ultimately, no one ever replaced the fascia boards and no one ever installed the new gutters.

Later, Mr. Anderson learned that a Gerard representative was supervising a roofing job two or three houses down from Mr. Anderson's home.  Thus, Mr. Anderson stopped by to speak with

---

[27] *See* Plaintiff's Exh. 1.

[28] *See* Plaintiff's Exh. 2 (business card of City inspector).

[29] *See, e.g.,* Plaintiff's Exh. 88.

[30] *See* Plaintiff's Exh. 86.

[31] *See* Plaintiff's Exh. 5 (copy of red tag).

the representative about the issues that he had had with JDR's roofing job.  Mr. Anderson asked

the representative to take a look at his roof.  After doing so, the Gerard representative informed

Mr. Anderson that what Mr. Razo had told him about the inability to install the counter-batten grid

due to the roof pitch was false and that a counter-batten roof system could have been utilized.

Subsequently, two other Gerard workers confirmed the same thing.

### E.    Mr. Anderson Files Suit Against JDR, Mr. Tatum, and Others

In July 2017, Mr. Anderson filed suit against JDR, Mr. Duncanson, Mr. Tatum, Mr. Razo,

and another contractor, Rodrigo Hernandez (collectively, the "**State Court Defendants**"), in

Texas state court, Cause No. 2017-004176-3, in the County Court at Law No. 3, Tarrant County,

Texas (the "**State Court Lawsuit**").  On May 7, 2018, Mr. Anderson filed his *Plaintiff's Second

Amended Petition* in the State Court Lawsuit (the "**State Court Petition**").[32]  Mr. Anderson

asserted both DTPA claims and a breach of contract claim against all of the State Court

Defendants, including Mr. Tatum.[33]  He claimed to have suffered $43,475.91 in actual damages

associated with the cost of replacing/repairing the roof and asserted a right to recover treble

damages under the DTPA for the alleged knowing and intentional nature of the State Court

Defendants' conduct plus the recovery of attorney's fees.[34]

Mr. Tatum filed an answer in opposition to the State Court Petition.[35]  It appears that both

JDR and Mr. Duncanson also filed answers.  Thus, a trial was scheduled for April 4, 2019.  Prior

to trial, however, Mr. Anderson and JDR (presumably along with Mr. Duncanson and Mr. Razo)

---

[32] *See* Defendant's Exh. B (copy of State Court Petition).

[33] *See* State Court Petition ¶¶ 9 and 10.

[34] *See* State Court Petition ¶¶ 11 and 15.

[35] *See* Defendant's Exh. D (State Court Judgment) (introductory paragraph, reciting that Mr. Tatum answered the State Court Petition).

agreed to engage in mediation with Mr. Anderson.  Consequently, only the claims against Mr. Tatum and Mr. Hernandez moved forward on April 4, 2019.

At the trial, the State Court conducted an evidentiary hearing on the claims.  Both Mr. Tatum and Mr. Hernandez failed to appear.  Following the evidentiary hearing, the State Court issued a *Final Judgment* in favor of Mr. Anderson, dated April 10, 2019 (the "**State Court Judgment**"), pursuant to which Mr. Anderson was awarded the following monetary relief against Mr. Tatum and Mr. Hernandez, jointly and severally: (a) actual roof damages of $45,000; (b) exemplary damages of $90,000; (c) attorney's fees of $14,437.50; (d) court costs of $1,692.42; and (e) the recovery of pre- and post-judgment interest.[36]

Thereafter, Mr. Anderson and JDR reached an agreement in settlement of Mr. Anderson's claims against JDR pursuant to which, among other things, JDR agreed to the entry of a $50,000 judgment against it.  Accordingly, on May 7, 2019, the State Court entered an *Agreed Final Judgment* against JDR (signed April 30, 2019) whereby, in final resolution of Mr. Anderson's claims against JDR, Mr. Anderson was awarded the sum of $50,000 against JDR (the "**JDR Settlement Judgment**").[37]

### F.  *Mr. Tatum Files for Bankruptcy Protection*

Facing a judgment debt in excess of $150,000 that he was unable to satisfy, Mr. Tatum decided to pursue bankruptcy protection.  Accordingly, on December 19, 2019, he filed his voluntary petition for relief under chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case.  In filing for bankruptcy relief, Mr. Tatum seeks to obtain a discharge of the

---

[36] *See* State Court Judgment.

[37] *See* Defendant's Exh. E (JDR Settlement Judgment).  No evidence was presented with respect to the disposition of Mr. Anderson's claims against Mr. Duncanson or Mr. Razo.

debt owed to Mr. Anderson pursuant to the State Court Judgment.  Mr. Anderson has initiated this adversary proceeding in an effort to preclude such discharge.

### DISCUSSION

Mr. Anderson asserts that the judgment debt owed to him by Mr. Tatum is nondischargeable pursuant to the provisions of section 523(a)(2)(A) of the Bankruptcy Code.  As relevant to this case, § 523(a)(2)(A) provides that a chapter 7 discharge does not discharge an individual debtor from "any debt for money, property [or] services … to the extent obtained by … false pretenses, a false representation, or actual fraud."[38]

### A.   Impact of the State Court Judgment

As reflected by the above-quoted language, § 523 of the Bankruptcy Code excepts from an individual chapter 7 debtor's bankruptcy discharge certain types of "debts."  The Bankruptcy Code defines "debt" as simply "liability on a claim"[39] and then expansively defines "claim" to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[40]  With this in mind, damages and other amounts awarded against a debtor pursuant to a prepetition judgment easily qualify as "debt" for purposes of § 523.  Here, however, Mr. Tatum challenges the existence of any debt, or alternatively the extent of the debt.  Consequently, the Court must initially address the issue of whether and to what extent the amounts awarded pursuant to the State Court Judgment constitute a debt for purposes of § 523.

First, Mr. Tatum appears to question whether the State Court Judgment may be considered at all.  In particular, characterizing the State Court Judgment as a default judgment, Mr. Tatum

---

[38] *See* 11 U.S.C. § 523(a)(2)(A).

[39] *Id*. § 101(12).

[40] *Id*. § 101(5)(A).

seemingly suggests that the judgment may not be considered under § 523 due to its default nature, asserting a number of affirmative defenses that only have relevance to the underlying causes of action asserted by Mr. Anderson in the State Court Lawsuit (*e.g.*, excused performance by breach of contract, ratification, waiver, failure to mitigate, equitable estoppel, and unclean hands).[41]  Mr. Tatum is incorrect in his assessment for at least two reasons.  First, the State Court Judgment is not a default judgment in the normal sense of the term.  Rather, it is a judgment that was entered after Mr. Tatum had answered and an evidentiary trial was conducted at which Mr. Tatum was given a full and fair opportunity to contest the relief requested.  The only "default" that occurred was Mr. Tatum's voluntary election to not attend the trial.  Second, even if the State Court Judgment had been a default judgment, while it is true that such a default judgment may not have any collateral estoppel effect for purposes of determining the *nature* of the judgment awarded (*e.g.*, whether the judgment debt was for money, property, or services *obtained by false pretenses, a false representation, or actual fraud*),[42] that does not thereby eliminate the existence of the "debt." Here, the time for Mr. Tatum to prosecute any defenses that he had to the causes of action asserted in the State Court Lawsuit has passed.  In entering the State Court Judgment, the State Court implicitly overruled all such defenses and this Court does not have the ability to question the State Court's adjudication of such matters.[43]  Accordingly, the judgment debt owed by Mr. Tatum under the State Court Judgment is a "debt" for purposes of § 523.

---

[41] *See* Answer ¶¶ 42-46.

[42] *See, e.g., Patino's, Inc. v. Poston (In re Poston)*, 735 F.2d 866, 868-70 (5th Cir.) (affirming determination that state court record contained insufficient detailed facts with respect to fraudulent conduct to support a determination of nondischargeability on collateral estoppel grounds), *cert. denied*, 469 U.S. 1086 (1984).

[43] *See Gilani v. Wynn Las Vegas, LLC (In re Gilani)*, No. 23-40477, 2024 WL 340822, at *3-4 (5th Cir. Jan. 30, 2024) (affirming the denial of relief on the basis of the *Rooker-Feldman* doctrine) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)).

Mr. Tatum's second challenge is that the judgment debt cannot be considered for § 523 purposes because nowhere within the State Court Judgment is there a finding of any fraudulent conduct on the part of Mr. Tatum. To evaluate this argument, it is important to consider both the specific allegations made in the State Court Petition and the specific terms of the State Court Judgment. Starting with the allegations of the State Court Petition, paragraph 6 of the petition identifies the following categories of roof replacement work that was either defectively provided or never commenced or completed:[44]

- The State Court Defendants "failed to remove damaged roofing materials of the old roof before overlaying them with new roofing material." (State Court Petition ¶ 6.I.).

- The State Court Defendants "did not [use] 15/32-inch thick plywood on the roof as required by building code regulations and Gerard manufacturing." (State Court Petition ¶ 6.J.).

- The State Court Defendants "sold to [Mr. Anderson] the type of roof installation as shown on page 14 of [JDR's] Gerard Roofing Sales Pamphlet, yet it is not the type of roof that was installed. Further, [State Court] Defendants told [Mr. Anderson] that the installation could not be done with the materials that had been ordered and delivered to [Mr. Anderson's] home, i.e. Defendant installed Baton [sic] roofing." (State Court Petition ¶ 6.L.).

- The State Court Defendants "were to install Radiant Barrier. However, [State Court] Defendants did not." (State Court Petition ¶ 6.O.).

- The State Court Defendants "failed to install new gutters as provided in the contract." (State Court Petition ¶ 6.P.).

- The State Court Defendants' "work has resulted in [Mr. Anderson's] house being 'red tagged' by the City of Arlington." (State Court Petition ¶ 6.Q.).

- The State Court Defendants "promised a personal inspection at the end of the job but that did not occur." (State Court Petition ¶ 6.T.).

---

[44] Paragraph 6 of the State Court Petition also includes allegations with respect to JDR's failure to obtain a building permit from the City of Arlington and with respect to the represented insurance specialization of JDR. *See* State Court Petition ¶¶ 6.G., 6.H., 6.S., and 9.B.(3). In relation to such matters, it is undisputed that JDR did eventually obtain a building permit and Mr. Tatum/JDR did successfully assist Mr. Anderson in successfully submitting an insurance claim to USAA that was fully approved.

In relation to those alleged actions and omissions, Mr. Anderson asserted that the State Court Defendants violated DTPA § 17.46(b)(24) "by failing to disclose information concerning services which was known at the time of the transaction [and] such failure to disclose such information was intended to induce [Mr. Anderson] into a transaction into which [Mr. Anderson] would not have entered had the information been disclosed, i.e., see the Facts above."[45]  Mr. Anderson also asserted a breach of contract claim against all of the State Court Defendants for failure to complete the roofing project on the terms agreed upon.[46]

Turning to the State Court Judgment, Mr. Tatum accurately points out that the judgment fails to specify upon which claim(s) (i.e., DTPA and/or breach of contract) the State Court found liability and awarded damages.[47]  Additionally, the State Court Judgment fails to expressly set forth any findings of fact.[48]  Consequently, the question for the Court is whether those omissions are fatal to Mr. Anderson's § 523(a)(2)(A) claim.  The Court finds that they are not.  Irrespective of the State Court's determination of the breach of contract claim, logically and necessarily it is clear from a review of the State Court Petition and State Court Judgment that the State Court found liability on the DTPA claim given the State Court's award of exemplary damages that could only have been predicated upon § 17.50 of the DTPA.[49]  On the flip side, however, given the existence of only group allegations made against all of the State Court Defendants (i.e., the absence of any personalized allegations against Mr. Tatum, alone), the lack of an express finding of Mr. Tatum's

---

[45] See State Court Petition ¶ 9.B.(5).

[46] See State Court Petition ¶ 10.

[47] See Defendant's Exh. D (State Court Judgment).

[48] See id.  Additionally, no record of the trial proceedings was introduced into evidence.

[49] See Tex. Bus. & Com. Code § 17.50(b)(1) (permitting total award of up to three times the amount of economic damages in the event the trier of fact determines that the defendant's actions in violation of the DTPA were committed either knowingly or intentionally).

knowledge of the falsity of any representations made, the lack of an express finding of Mr. Tatum's intent to deceive or otherwise cause harm, the lack of an express finding of any other actual fraud on the part of Mr. Tatum, and the lack of a record of the trial proceedings, Mr. Tatum is correct in his argument that the State Court Judgment has no collateral estoppel effect with respect to a determination of the *nature* of the judgment for purposes of § 523(a)(2)(A) (*i.e.*, whether and to what extent the judgment debt was for money, property, or services *obtained by false pretenses, a false representation, or actual fraud*).[50]   Hence, Mr. Anderson continues to be burdened with the obligation to prove that the judgment debt is of a nature making it nondischargeable under § 523(a)(2)(A).

Third, Mr. Tatum challenges the amount of the judgment debt that is subject to determination under § 523.  In this regard, Mr. Tatum first argues that he is entitled to a $50,000 credit on account of the JDR Settlement Judgment.  With respect to such argument, "[u]nder the common-law one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered."[51]   As such, where a plaintiff settles with one of the defendants, the one-satisfaction rule manifests itself in the form of a settlement credit in relation to the other defendants so as to prevent windfalls and collusive settlements.[52]   Here, the $50,000 JDR Settlement Judgment against JDR was entered after the State Court Judgment had been entered against Mr. Tatum.  At trial, Mr. Anderson acknowledged that JDR had paid the $50,000 JDR Settlement Judgment.  Thus, under the common-law one-satisfaction rule, it would appear that Mr. Tatum is entitled to a settlement

---

[50] *See, e.g., Stanley v. McLain (In re McLain)*, Adversary No. 09-6016-RBK, 2011 WL 1638578, at *4 (Bankr. W.D. Tex. Apr. 29, 2011); *see also Pancake v. Reliance Ins. Co. (In re Pancake),* 106 F.3d 1242, 1244-45 (5th Cir. 1997); *Demonbreun v. Devoll (In re Devoll)*, Adversary No. 15-05025, 2015 WL 9460110, at *3-5 (Bankr. W.D. Tex. Dec. 23, 2015).

[51] *Bay, Ltd. v. Mulvey*, No. 22-0168, 2024 WL 874798, at *3 (Tex. Mar. 1, 2024); *see also Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106-07 (Tex. 2018).

[52] *Mulvey*, 2024 WL 874798, at *3; *see also Virlar v. Puente*, 664 S.W.3d 53, 60 (Tex. 2023).

credit of $50,000 as of the date that such payment was made to Mr. Anderson, to be applied against the non-exemplary damages portion of the State Court Judgment. Mr. Anderson disputes the same, arguing that the JDR Settlement Judgment does not evenly overlap with the amounts awarded pursuant to the State Court Judgment (*e.g.*, a portion of the agreed upon judgment with JDR was designed to compensate Mr. Anderson for the attorney's fees incurred in connection with the JDR mediation). Ultimately, for purposes of the case before this Court, it is unnecessary to determine if, and to what extent, Mr. Tatum is entitled to a credit on account of the JDR Settlement Judgment. The Court will simply refer to the amount of the State Court Judgment remaining after any such allowable credit is applied as the "**Judgment Debt**."

Finally, focusing on the exemplary damages portion of the State Court Judgment, Mr. Tatum challenges the validity and enforceability of such damages, arguing that in making Mr. Tatum and Mr. Hernandez jointly and severally liable for such damages instead of individualizing such relief, the State Court failed to comply with § 41.006 of the Texas Civil Practice and Remedies Code (the "**TCPRC**"). TCPRC § 41.006 provides that "[i]n any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant."[53] Thus, pointing to case law purporting to permit the collateral attack of a void state court judgment, Mr. Tatum argues that the State Court Judgment is void to the extent of the exemplary damages award for violation of TCPRC § 41.006.[54] Here, however, it is unnecessary for the Court to consider such challenge. As previously indicated, it is apparent from a review of the State Court Petition and State Court Judgment that the State Court awarded exemplary damages under DTPA

---

[53] *See* Post-Trial Brief ¶ 2; Tex. Civ. Prac. & Rem. Code § 41.006.

[54] *See* Post-Trial Brief ¶¶ 3-12 (and cases cited therein).

§ 17.50.[55]   Importantly, DTPA § 17.50 expressly provides that chapter 41 of the TCPRC is inapplicable to a claim pursued under the DTPA.[56]  Thus, Mr. Tatum's attack of the Statement Judgment Debt on the basis of TCPRC § 41.006 is unavailing, and the full amount of the Judgment Debt will be considered for purposes of Bankruptcy Code § 523.

**B.    *Evaluation of the Judgment Debt Under Bankruptcy Code § 523(a)(2)(A)***

This, then, takes the Court to an evaluation of the Judgment Debt under Bankruptcy Code § 523(a)(2)(A).  Mr. Anderson asserts that the Judgment Debt was for money, property or services obtained by false pretenses, a false representation, or actual fraud.

To establish that a debt for money, property or services was obtained by false pretenses, a plaintiff creditor must prove the following: (1) the debtor made a false representation; (2) the debtor knew the representation was false; (3) the debtor made the representation for the purpose of inducing the creditor to part with money or property; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor parted with money or property as a proximate result.[57]  Similarly, to establish that a debt for money, property or services was obtained by a false representation, a plaintiff creditor must prove the following: (1) the debtor made a false representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.[58]

---

[55] *See* Tex. Bus. & Com. Code § 17.50(b)(1) (permitting an award of up to three times the amount of economic damages in the event the trier of fact determines that the defendant's actions in violation of the DTPA were committed knowingly or intentionally).

[56] *See id*. § 17.50(g).

[57] *See Dare v. Jenkins (In re Jenkins)*, 607 B.R. 270, 282 (Bankr. N.D. Tex. 2019).

[58] *See Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018) (citing *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)); *see also General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *Leon v. Bianco (In re Bianco)*, Adversary No. 20-04003, 2022 WL 3954547, at *11 (Bankr. N.D. Tex. Aug. 30, 2022).

In both cases, a determination of nondischargeability is dependent upon the court finding

both that the debtor knew of the falsity of the misrepresentation when made and that the debtor

made the misrepresentation with the intent to deceive the creditor.  Intent to deceive may be

inferred where the debtor "knows or should know that [the misrepresentation] will induce another

to act"[59] or "from a 'reckless disregard for the truth or falsity of the statement combined with the

sheer magnitude of the resulting misrepresentation.'"[60]  However, a debtor's "honest belief, even

if unreasonable, that a representation is true and that the [debtor] has information to justify … does

not amount to an intent to deceive."[61]

Separately, to establish that a debt for money, property or services was obtained by actual

fraud (other than by false pretenses or a false representation), a plaintiff creditor must prove the

following: (1) the debtor engaged in fraudulent conduct; (2) the debtor undertook such action with

wrongful intent; and (3) the creditor sustained a loss as a proximate result.[62]  In this case, wrongful

intent may be found where the debtor undertook the fraudulent conduct with the subjective motive

to cause harm to the creditor or where there was an objective substantial certainty that harm would

be caused to the creditor by virtue of such conduct.[63]

Mr. Anderson has the burden of proving each of the elements of nondischargeability under

§ 523(a)(2)(A) by a preponderance of the evidence.[64]  In this case, while the State Court Petition

underpinning the State Court Judgment provides little in the way of detailing any specific

---

[59] *Manheim Auto. Fin. Servs., Inc. v. Hurst* (*In re Hurst*), 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005).

[60] *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383 (Bankr. N.D. Tex. 2017).

[61] *Id.*

[62] *See Jenkins*, 607 B.R. at 283.

[63] *Cf. Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999) (detailing analogous level of proof required to establish deliberate or intentional conduct for purposes of proving that an injury is willful and malicious for purposes of 11 U.S.C. § 523(a)(6)).

[64] *Saenz*, 899 F.3d at 394; *Mercer*, 246 F.3d at 403.

misrepresentations or other fraudulent conduct, the Complaint lays out a variety of alleged misrepresentations that Mr. Tatum claims to have supported the State Court Judgment. Thus, the misrepresentations of the Complaint are categorically considered below.

### 1. *Representations With Respect to Overall Experience, Expertise and Business Practices*

First, Mr. Anderson claims that Mr. Tatum misrepresented his own level of experience and expertise in the roofing industry and the degree to which his offered business practices were developed and established.[65]  While rather obscure in concept, Mr. Anderson specifically alleges in the Complaint that Mr. Tatum misrepresented his experience as a roofing installer and in working with suppliers, municipalities, and insurers, his familiarity with roofing industry standards and practices, his own roofing installation practices, his knowledge of and compliance with all applicable laws, regulations, and city codes related to roof repairs, his willingness and ability to perform the installation work in a manner compliant with all applicable laws, regulations and city codes, and his ability to complete a roof inspection.[66]  In response, Mr. Tatum, in large part, disputes having made any representations at all with respect to these matters. However, where representations were made, he disputes that they were false. The Court agrees.

Initially, having considered the testimony of both Mr. Anderson and Mr. Tatum, the Court finds that Mr. Anderson failed to establish by a preponderance of the credible evidence that Mr. Tatum made any representations, much less misrepresentations, with respect to his *individual* experience in installing new roofs, his willingness or ability to perform any such installation work, or of his familiarity with any roofing industry standards, practices, laws, regulations, or city codes. Mr. Tatum was, quite simply, a salesman for JDR. He had never personally installed a roof and

---

[65] *See* Complaint ¶¶ 35 and 39.

[66] *See* Complaint ¶¶ 15, 17 and 23.

did not profess to have any such expertise.  Based upon the business card that Mr. Tatum presented to Mr. Anderson when they first met (which described Mr. Tatum as an insurance specialist), Mr. Tatum expressly represented, at most, having expertise in assisting customers with roof damage insurance claims.  Thereafter, based upon his proposal to inspect Mr. Anderson's roof for damage, Mr. Tatum implicitly also represented that he had a level of experience and expertise in conducting roof inspections.  With respect to both sets of representations, Mr. Anderson failed to present any evidence of a representation that was false.  Indeed, Mr. Anderson successfully inspected Mr. Anderson's roof, identified and reported on areas of damage, and assisted Mr. Anderson in successfully submitting an insurance claim to USAA that was approved.

Next, Mr. Anderson claims that Mr. Tatum misrepresented *JDR's* level of experience and expertise in the roofing industry and the degree to which its offered business practices were developed and established.[67]  Again, while rather obscure in concept, Mr. Anderson specifically alleges in the Complaint that Mr. Tatum misrepresented that JDR was a licensed roofer in the State of Texas and misrepresented JDR's familiarity with roofing industry standards and practices, JDR's own roofing installation practices, JDR's knowledge of and compliance with all applicable laws, regulations, and city codes related to roof repairs, and JDR's willingness and ability to perform the installation work in a manner compliant with such laws, regulations and city codes.[68] In response, Mr. Tatum again disputes having made any specific representations with respect to these matters.  However, where representations were made, he disputes that they were false, or if false, that he knew of the falsity or that he represented any such matters with the intent to deceive or otherwise cause harm to Mr. Anderson.  The Court again agrees.

---

[67] *See* Complaint ¶¶ 35 and 39.

[68] *See* Complaint ¶¶ 15-17 and 23.

Initially, with respect to JDR's licensing status, Mr. Anderson failed to establish by a preponderance of the credible evidence that Mr. Tatum, in fact, expressly represented that JDR was a licensed roofer.  Next, with respect to JDR's knowledge of applicable laws, regulations, and city codes and willingness to perform the work in compliance with such laws, regulations, city codes, Mr. Anderson further failed to establish by a preponderance of the evidence any specific representation with respect to JDR's knowledge of or history of compliance with any particular law, regulation, or city code that Mr. Tatum knew to be false.  Again, Mr. Tatum was a salesman. When he generically assured Mr. Anderson that JDR was fully qualified and would take care of all necessary permits and licenses for the job, he genuinely believed that to be true.  He had no idea that JDR would fail to timely obtain a roofing permit or in any other way fail to comply with all applicable laws, regulations, and codes.  As explained at trial, as of the time of his solicitation of business from Mr. Anderson, Mr. Tatum knew JDR to be an established and successful roofing company and he had no knowledge of any prior customer complaints or of any prior instance where JDR had failed to timely obtain a permit or fully comply with the law.  Simply put, he had no reason to believe that JDR would fail to timely obtain a permit or fully comply with any applicable laws, regulations, or codes in relation to the Anderson project.

Finally, with respect to JDR's familiarity with roofing industry standards and practices and JDR's own roofing installation practices, the Court again finds that Mr. Anderson failed to establish that Mr. Tatum made any specific representations.  Notwithstanding same, Mr. Anderson asserts that the Court should find that Mr. Tatum, in selling Mr. Anderson on JDR, impliedly represented that JDR was familiar with roofing industry standards and practices and that JDR's own roofing installation practices were consistent with such standards and practices.  While the Court tends to agree with this argument, it does not thereby negate the burden of Mr. Anderson to

prove the falsity of such implied representations. Here, for example, while JDR clearly failed to comply with the industry standard of replacing all rotted decking before installing a new roof, no evidence was presented of JDR's lack of knowledge of such industry standard or of any individualized practice on its part to ignore such standard. Quite to the contrary, JDR subcontractors on the job expressly recognized that the rotted wood would need to be replaced before the new roof could be installed. Mr. Tatum simply reaffirmed his belief that JDR would comply with this standard when he spoke with Mr. Anderson about the matter. Ultimately, the JDR subcontractors assigned to the Anderson project failed to comply with JDR's practices and industry standards. However, JDR's failure to properly perform does not equate to proof of a misrepresentation on the part of Mr. Tatum as to JDR's knowledge of and intent to comply with industry standards and practices, nor does it equate to evidence of intent on the part of Mr. Tatum to deceive or otherwise harm Mr. Anderson.

Therefore, Mr. Anderson's objection to the dischargeability of the Judgment Debt under § 523(a)(2)(A) on the foregoing bases will be denied.

### 2.    *Representations With Respect to Specific Work to be Performed*

Next, Mr. Anderson focuses on alleged misrepresentations made with respect to the specific work to be performed. In particular, Mr. Anderson focuses on the following:

### *Type of Roof Installation*

First and foremost, Mr. Anderson claims that Mr. Tatum made misrepresentations (both affirmatively and by omission) with respect to the promised use of a counter-batten grid system to install the new roof.[69] On the front end, Mr. Anderson claims that, during the sales process, Mr. Tatum knowingly and fraudulently assured him that the counter-batten system that he desired

---

[69] *See, e.g.*, Complaint ¶¶ 11, 21 and 39.

would be utilized.  In response, Mr. Tatum denies having any knowledge of the falsity of such representations and denies having made any representations with the intent to deceive or otherwise harm Mr. Anderson.  Having carefully considered the testimony of both Mr. Anderson and Mr. Tatum, the Court finds that Mr. Anderson has failed to establish by a preponderance of the credible evidence that Mr. Tatum both knew that the assurances provided were false and that he made the assurances with an intent to deceive or harm Mr. Anderson.

In this regard, Mr. Tatum credibly testified that, when Mr. Anderson directed Mr. Tatum's attention to the page of the Gerard brochure on which the picture of the counter-batten grid was displayed and on which the energy efficiencies to be gained from a batten or counter-batten installation system were described, he was personally unfamiliar with batten and counter-batten installation systems and, thus, placed a call to the JDR home office to seek guidance on how to address it on the work order form.  During that call, Mr. Tatum ultimately turned the phone over to Mr. Anderson so that Mr. Anderson could speak directly to JDR home office personnel about the specific installation desired.  Based upon the exchange that he heard, Mr. Tatum was of the honest belief that Mr. Anderson and JDR were clear on the installation system that would be utilized.  Thereafter, Mr. Tatum was not responsible for procuring the necessary materials or for doing the installation work.  Tara Swofford, an office manager at JDR during Mr. Tatum's employment, testified that it was the office manager's responsibility, and not the salesperson's, to ensure that all required materials for the roofing project were purchased.  Moreover, later, when Mr. Anderson contacted Mr. Tatum to complain about the failure of the roofing contractors to utilize a counter-batten grid, Mr. Tatum contacted JDR for the purpose of resolving the error.  Had Mr. Tatum known that JDR was never going to use a counter-batten system, he would not have contacted the home office in an effort to correct the error.

On the back end, Mr. Anderson claims that, after he contacted Mr. Tatum and JDR to complain about the incorrect installation system being used, Mr. Tatum made additional misrepresentations through omission by, first, failing to correct the subcontractor who represented to Mr. Anderson that JDR's supplier did not have the necessary counter-batten materials in stock and by, second, failing to correct Mr. Razo's subsequent misrepresentation to Mr. Anderson that the counter-batten system could not be utilized due to the pitch of the roof.  In response, Mr. Tatum denies having, himself, made any such representations, denies having any knowledge of the falsity of the representation made with respect to the materials supplier, and denies having any knowledge, at all, of the misrepresentation made by Mr. Razo.  In both cases, Mr. Tatum also denies having undertaken any action, whether affirmative or through omission, with the intent to deceive or otherwise harm Mr. Anderson.  Having carefully considered the testimony of both Mr. Anderson and Mr. Tatum, the Court finds that Mr. Anderson failed to carry his burden of proof under § 523.

First, in the case of the subcontractor's representation that the supplier did not have the necessary materials on hand, Mr. Tatum had no reason to doubt the truth of the representation. The very reason that Mr. Tatum had the roofing subcontractor come out to the house with him was because it was the subcontractor, not Mr. Tatum, who had communicated with the supplier on materials.  Mr. Tatum had no reason to doubt the subcontractor and Mr. Anderson failed to present any evidence of Mr. Tatum's knowledge to the contrary.   Second, in the case of the misrepresentation made by Mr. Razo, Mr. Tatum convincingly testified that, after Mr. Anderson had phoned the JDR home office on multiple occasions to express his displeasure with the project, Mr. Duncanson decided to pull Mr. Tatum off of the job.  As a result, Mr. Tatum was not present

when Mr. Razo misrepresented the inability to use the counter-batten grid due to the pitch of the

roof.  He did not learn of the misrepresentation until after Mr. Anderson had initiated litigation.

Therefore, Mr. Anderson's objection to the dischargeability of the Judgment Debt under §

523(a)(2)(A) on this additional basis will be denied.

### *Replacement of Rotted Decking Before Installation*

Next, Mr. Anderson claims that Mr. Tatum misrepresented that JDR would remove and

replace all of the rotted decking before the new roof was installed.  Here, again, Mr. Anderson

failed to prove by a preponderance of the evidence that Mr. Tatum knew that JDR would fail to

undertake such action.  To the contrary, Mr. Tatum credibly testified that, based upon the lengthy

training that he obtained from Ms. Beer and his observation of insurance adjuster inspections, he

believed that all of the rotted decking would, in fact, be pulled up and replaced in advance of laying

the new roof.  Indeed, he even explained to Mr. Anderson the method that he understood would

be employed by the subcontractors to locate areas of rotted wood.  Moreover, even the JDR

installation crew assigned to the project informed Mr. Anderson that the rotted decking would be

replaced prior to the new roof's installation.  While obviously JDR failed to properly remove and

replace all rotted decking, such failure does not translate to evidence of Mr. Tatum's knowledge,

as of the time that the representations were made, that JDR would fail to properly perform the

work.

Consequently, Mr. Anderson's objection to the dischargeability of the Judgment Debt

under § 523(a)(2)(A) on this basis will also be denied.

### *Type and Quality of Goods to be Used in Connection with the Installation*

Third, Mr. Anderson claims that Mr. Tatum made a variety of misrepresentations with

respect to the type, quality, and necessity of materials to be used in connection with installing the

new roof.[70] Once again, the assertion is obscure in concept. However, Mr. Anderson specifically highlights the failure of JDR to supply screws instead of nails,[71] the alleged failure of JDR to use plywood of an appropriate thickness,[72] the failure of JDR to install a radiant barrier,[73] the failure of JDR to replace the skylights, the failure of JDR to replace rotted facia boards, and the failure to install new gutters,[74] in each case in the face of Mr. Tatum's alleged representations that these items would be provided/handled. In response, Mr. Tatum denies having made any representations that he did not believe to be true at the time of making them and denies having made any representations with the intent to deceive or otherwise harm Mr. Anderson. After carefully considering the testimony presented, the Court again agrees with Mr. Tatum and finds that Mr. Anderson has failed to carry his burden of proof.

Initially, the Court notes that no credible evidence was introduced of a particular representation made by Mr. Tatum with respect to the size of plywood to be used on the project (much less evidence of JDR's actual use of any improperly-sized plywood). Next, with respect to the assurance that screws would be used instead of nails, Mr. Tatum credibly testified that he honestly believed that the screws would be delivered to the site. Moreover, given that Mr. Tatum immediately and successfully had JDR supply screws to the site after learning of the error, no harm was caused. Finally, with respect to the remaining complaints, the representations at issue come from the work order form completed by Mr. Tatum in the company of Mr. Anderson. In relation to same, Mr. Tatum credibly testified that he fully believed that JDR would both order the

---

[70] *See generally* Complaint ¶¶ 35 and 39.

[71] *See* Complaint ¶ 13.

[72] *See* Complaint ¶ 19.

[73] *See* Complaint ¶¶ 12 and 21.

[74] *See* Complaint ¶ 21.

necessary materials and complete the work indicated.  In this regard, as a JDR salesman, Mr. Tatum's responsibility was to fill out the work order form for the JDR home office so that the home office personnel would know which materials to order.  Here, with Mr. Anderson's input and approval, Mr. Tatum filled out the work order form in conformity with his training and as directed by his supervisor, Ms. Beer.  Importantly, Mr. Tatum was not the one who would be replacing the rotted facia boards, replacing the skylights, installing the radiant barrier, or installing the new gutters.  And no evidence was presented of Mr. Tatum's knowledge, as of the time of his completion of the work order form, that JDR would fail to order any of the necessary materials or complete any of the work.

In short, the Court finds that Mr. Anderson failed to prove by a preponderance of the credible evidence that Mr. Tatum knowingly made any false representations with respect to the above-described items or that Mr. Tatum made any representations with the intent to deceive or otherwise harm Mr. Anderson.  Instead, Mr. Tatum held the honest belief that JDR would fulfill its responsibility in completing the project as agreed upon.  Consequently, Mr. Anderson's objection to the dischargeability of the Judgment Debt under § 523(a)(2)(A) on these bases will also be denied.

### 3.      *Representations with Respect to Supervision and Final Inspection*

Finally, Mr. Anderson claims that Mr. Tatum misrepresented that he would supervise the installation, allegedly guaranteeing that all city codes would be followed,[75] that he would inspect the structural integrity of the decking after the tear off phase to ensure that all of the rotted decking had been repaired,[76] and that he would, upon completion, conduct a final inspection to ensure that

---

[75] *See* Complaint ¶¶ 18, 24 and 39.

[76] *See* Complaint ¶ 17.

all of the agreed upon work had been completed.[77]  Mr. Tatum disputes that he ever indicated that

he would supervise any work, *per se*, or conduct any sort of quality inspections of any of the work

performed.  He claims that he only represented that he would check in on progress with Mr.

Anderson as the project got underway and progressed.

In relation to the foregoing, the Court finds that Mr. Tatum credibly testified that he never

represented that he would be supervising any of the work to be performed, never guaranteed any

sort of legal compliance, and never represented that he would conduct any sort of quality inspection

after the work had been performed.  He did not have the expertise to do any of these things, nor

did he profess to have such expertise.  Instead, Mr. Tatum credibly testified that his only

representation was that he would periodically check in on the status of the project as it progressed.

Ms. Swofford also confirmed that JDR sales personnel were required to check in with customers

during the course of the roof's installation.  Importantly, a periodic check-in with a customer is

quite different than the supervision of work being performed or the conduct of a quality inspection

of work upon completion.  Those were tasks left to the foremen of the work crews.

Additionally, while Mr. Tatum did indicate that he would be present at the commencement

of the installation, the Court finds that Mr. Tatum did not make the representation with

contemporaneous knowledge that he would not be there, nor did he make the representation with

any intent to deceive or otherwise harm Mr. Anderson.  Instead, Mr. Tatum credibly explained

that, while he fully planned to be present, he was unexpectedly sick on the day that the installation

began and stayed home from work.  Even so, once he received Mr. Anderson's frustrated

voicemail, despite being ill he immediately placed a call to the JDR home office to get the errors

highlighted by Mr. Anderson addressed.  Such conduct is indicative of having honest intentions as

---

[77] *See* Complaint ¶ 18.

opposed to deceptive/wrongful intentions.  Finally, as for Mr. Anderson's complaint about Mr.

Tatum's failure to look over the project once done, it was Mr. Anderson, himself, who successfully

caused Mr. Duncanson of JDR to remove Mr. Tatum from the project.  Thus, the failure of Mr.

Tatum to check in on the project after being removed from the project by Mr. Duncanson cannot

credibly be used by Mr. Anderson as evidence of a false statement by Mr. Tatum or of any intent

on the part of Mr. Tatum to deceive or otherwise cause harm to Mr. Anderson.

Consequently, Mr. Anderson's objection to the dischargeability of the Judgment Debt

under § 523(a)(2)(A) on these bases will also be denied.

### *CONCLUSION*

Based upon all of the foregoing, the Court finds and concludes that Mr. Anderson has failed

to prove by a preponderance of the credible evidence that the Judgement Debt is a debt for money,

property or services obtained by false pretenses, a false representation, or actual fraud.

Consequently, Mr. Anderson's objection to the discharge of the Judgment Debt under §

523(a)(2)(A) of the Bankruptcy Code will be denied.  The Court will separately issue a judgment

in conformity herewith.

### # # #   END OF MEMORANDUM OPINION   # # #